Okay, so we have two more cases this morning. We will go to Luna v. Malfi. You have returned. I have returned, Your Honor. This time I will try not to argue against myself. Philip Trevino on behalf of the petitioner appellant, Mr. Luna. May it please the Court. You know, I noticed in both cases that you didn't file reply briefs. Is that right? I don't recall offhand. I know that in this matter I did not. I thought in Thompson I had, but perhaps I'm mistaken. Thompson is helpful. Anyway, go ahead. My own practice varies significantly depending on the individual matter. All right. Go ahead. With regard to the Respondent's argument that Deputy District Attorney Inomoto's testimony had other purposes, I must just respectfully and completely disagree. Mr. Inomoto began the premise before the trial court indicating that he would be testifying by saying, and this is mentioned in the AOV, that this is just for the limited purpose of clarifying the Alarcon conversation at the Orange County Jail. The trial judge on several occasions thereafter observed that that was the purpose of District Attorney Inomoto's testifying. It was to rebut Alarcon, the assertions or the insinuations that he had not made the prior statements that he was denouncing now in court. So although Respondent perceives alternative purposes for that testimony, Petitioner simply doesn't, not on this record. The trial judge clearly didn't at the time the testimony was offered. And the testimony does seem to run in direct violation of Berger versus United States. Or do we pronounce it Berger? I'm sorry. You pronounce it Berger, and I don't understand. That case was not a constitutional case. It was. It resulted in a prohibition from the U.S. Supreme Court as to an attorney vouching for the credibility of a witness. But tell me how he was vouching. My understanding is that what he said was he didn't say, I believe he was telling the truth, that he was reporting on what he said and whether he equivocated when he said it and whether he expressed any uncertainty. But he didn't express his own opinion in any way. Because the trial judge ordered him not to. So what? He didn't. He didn't. That's correct. So why was he vouching? Because he got up and testified before the same jury before whom he was prosecuting the trial for the case that what the prosecution was saying was actually true. He put the prosecution in the position of bolstering that version of events, that Alarcon, the critical witness, the only true witness, if you will, that actually identified my client as the perpetrator, that what Alarcon had said pretrial, that that was a true version. But he did say that. That's what I'm trying to tell you. How did he say that? I think his testimony, getting up before the jury and saying this is what occurred and this is what Alarcon said, in light of all of the squabbles that had happened prior to that point where it was, and this was a very hotly debated trial, and all counsel were, in my judgment, quite difficult in the court. I think it demonstrated a great amount of forbearance. But it was hotly in dispute as to what, if anything, Alarcon said was trustworthy. The trial judge makes that comment. It's in the briefing before this Court that Alarcon was essentially not credible at all. And then Mr. Inomoto got up and said, this is what actually happened, ladies and gentlemen. I think, Your Honor, that that has a really powerful sway with the ladies and gentlemen of a jury. To have a prosecuting attorney, there's a squabble going on. Tell me how we deal with AEDPA in this case. Is there a Supreme Court case that says that? We're governed by AEDPA. The petition is a post-AEDPA petition. But I don't perceive that as any problem to my client's position because the case law is clear. And it is Supreme Court case law. This is where I come back to Berger. I think Berger is the controlling authority. It has been the law for decades. We're not relying on the advocate-witness rule. Respondents seem to have missed or recast Petitioner's arguments, turning them on their head and saying that that is our primary reliance. No. That's a secondary point. It's true. We believe it bolsters the argument. But it's Berger that is the core support for this position. And that is Supreme Court authority that we perceive on point so that even though this is an AEDPA case, we're not hampered in any way. We're not asking this to court to create a new law. We're asking it simply to recognize and apply preexistence. So Berger says that the prosecutor overstepped the bounds because he misstated the facts in his cross-examination. He put into the mouths of subsequent witnesses things they hadn't said. He suggested by his statements that statements had been made to him personally out of court in respect to which no proof was offered. But here proof was offered. He testified under oath. And so on. I mean, at least a lot of the vice of vouching is precisely that the person is not a witness and isn't testifying under oath and is purporting to rely on something outside the court which the jury isn't being told about. Here the jury was given the facts. You Honor, I have to disagree because I believe the vice, the true vice, is placing the imprimatur of that office on this version of facts. But then you are making a prosecutor witness wrong. No. I think it would apply equally to a defense attorney who puts him or herself in that position of becoming a material witness in that matter. And the gravamen is that it is an agent of the people standing in front, putting on the case and now saying, okay, this is wobbly. Excuse me. I'm going to take the stand and now clarify it for you all. I think this goes further than Berger did in terms of its egregiousness. This is different, but it's not different in a mitigated way. It's different in an aggravated way. We have gone even further than I think anything that Berger. I can't imagine, it's difficult for me at least to imagine the Berger court saying, oh, well, it's not okay for you to stand at the lecture and do those things, but it's perfectly fine for you to get up on the witness stand and do it. No, I think we go much further afield. As advocates, we're to be impartial. We're only to be there to argue, but we're not to be participants. What if we assume improper vouching? What about the Brecht analysis? Isn't there other evidence that a jury could reasonably evaluate and convict, such as the gun at Luna's feet a month after? Isn't that strong circumstantial evidence that Luna, in fact, possesses the gun and was the shooter? Your Honor, it wasn't for the trial judge, because the trial judge made the observation that this was a weak case as to the Petitioner. But as to what he specifically vouched for, if you regard it as vouching, Alarcon was entirely not credible, meaning that as to that particular question, i.e., whether he had identified those people previously and been certain about it, because he had written it down and he had signed his name. Now he was standing up there saying, I didn't sign it, write it down, and I didn't sign my name, but I didn't write it down, and I never did it. And the only thing that the prosecutor was testifying to was that he did, in fact, write it down and say that he was at no, I'm sorry, that's not true. What he was testifying to was that he later said, I was sure what I'd written that. Your Honor, those four pages of Deputy District Attorney Inomoto's testimony in my reading convey a very clear image to the jury that what we, we the prosecution have put before you as what happened, it's all of what we told you, and so basically you can ignore the fact that he's not credible today in court. Yes, it did. And is there any chance that wasn't going to happen anyway? Respectfully, yes, I believe it wasn't. Why? That doesn't mean they believe him about whether or not this person, he actually saw what he said he saw. And nothing that Inomoto testified to was going to make it more probable that he actually saw what he said he saw. But as to whether he said he saw it, there's no chance they weren't going to think that. But they would have been left in a conundrum to figure out these facts on their own. And they still weren't, because the prosecutor didn't say, I know it's true that he saw it. All he said was that I know for sure that he said he saw it. And coupled with that. And it was clear that he said he saw it. I mean, he saw the piece of paper. I agree. That piece of paper is a significant piece of evidence. So what did Inomoto add that made a bit of difference? It is, he adds the weight of his office to that version, i.e., that what Alarcon told us in that county jail interview was, in fact, the real story that that's. No, he never said that. What he said was. He doesn't say it, but he said just. I didn't even imply it. All he said was that Alarcon was sure of the identification. And that this interview did happen. And that he did give us the recall. And that he did talk about all these different things. Doesn't it in some ways merely corroborate what Detective Lowe testified to? That when Alarcon made the initial idea, it was immediate and positive? That's essentially what Inomoto said. To some points, yes. But there's some points where he and Detective Lowe were disagreeing, as I recall. And as to the points where it was disagreeing, Inomoto was somewhat exculpatory. Yes. Potentially. Well, that develops later. That's an attempt by the defense to use this now. To have this bomb that has been dropped in front of it to now somehow turn it around. And then AG would like to use it. Well, the defense had said they were going to put Inomoto on it because they wanted to make this point. But how many times have defense attorneys said they didn't do something? Well, I know, but they regarded. They did not follow through. Aside from that, they regarded the point as in their favor. It came out of the direct examination, not the cross. But clearly not once it happened. What do you mean, clearly not once it happened? Because they moved to strike the testimony. They moved for a mistrial. They moved for a new trial subsequent. So clearly, they may have at some point used. Well, it may have been, you know, very questionable for him to continue as the prosecutor at that point. But that's not your issue. It isn't. And had this testimony been offered during the defense case or had it been offered in the people's rebuttal, we wouldn't be here today. But it is that it came up in the people's case in chief that makes this so offensive. Can you explain that to me? Why? Yes, because if the defense in fact had called Inomoto, as it had indicated it might have. No, no, no. You said it came up in the rebuttal. If the defense had opened the door to it in the defense case, then it might, it might, and I emphasize might, have become appropriate for the district attorney then if he was the only viable source of the evidence to take the stand. And, of course, we know he wasn't the only viable source. There was a law clerk there. And we're left to speculate why the law clerk wasn't available, because there's no record on that. There could be a record. Can we return for a moment, assuming you win on the vouching argument and it's improper to look to the totality of the record? Here, Inomoto in his rebuttal argument, the first words out of his mouth were essentially, ladies and gentlemen, you can ignore all of the defense argument about the eyewitness identification. We have the gun at Luna's feet. And he went into a circumstantial evidence argument, essentially, that that place is Luna's, the shooter, which corroborates the eyewitness. Your Honor, it's at Petitioner's feet in the co-defendant's car, and that still doesn't put that gun in the Petitioner's hands at the time of the events. It still doesn't show he's the shooter. But isn't it circumstantial evidence that he possesses it, that it's his? It's in his feet in the car at 3 a.m.? It is an interpretation, but it's just that. There were so many versions flying fast and furious with so many witnesses giving contradictory versions and interpretations to the events. And I come back that that is why the trial judge said this was a very thin case as to the Petitioner. I guess, Your Honor, respectfully, I'd have to say that the trial judge, hearing all the testimony, watching it all unfold, didn't seem to have the certainty Your Honor may have, that it was such a strong case as to my client. But he ultimately denied the new trial motion. So that would imply that he must have thought there was sufficient evidence. And the premise for the denial clearly articulated by the trial court at the time was because it was an untimely motion and the trial judge was frustrated that the objection had not been registered so that the court could have addressed it timely. And that, of course, folds us into our second issue, the IAC claim that's before this Court. If, in fact, that was the justification for the trial court's denial, then why didn't trial counsel actually move more aggressively to preclude this evidence in the first instance? Well, but it could be technical to bring out third-party culpability. I mean, that was the initial motivation. I don't believe that was the motivation. It's a potential development once the testimony has been given. But I don't believe that because Inomoto said that wasn't his motivation. We don't have a silent record here that we must speculate on. Well, that part I don't understand. What was said was somewhat vague, but it certainly would have covered that. He says He said he wanted to clarify the Alarcon testimony. The only thing unclear about it at that point was precisely whether he had said this thing about the wizard. Well, but the trial judge also says, well, he, Inomoto, is rebutting Alarcon's testimony, basically. And I guess, yes, it could be construed as strictly going to wizard, Your Honor, but in the context of the comments that the trial court has or the conversations the court is having with the trial lawyers, it doesn't seem that that's the indication. And the context of the litigation surrounding the post-trial, the motion to strike and the post-trial motion for new trial, it seems clear the Court's mostly frustrated that the objection was not articulated more clearly and that it all hangs on that Inomoto has put himself into this position. There are other indications in the record that Inomoto clearly didn't construe this as a problem. He objects during trial counsel's closing argument. Excuse me. He, during his closing argument, says, and you didn't see the defense attorneys vouch for their witnesses. And defense counsel object and said no attorney can vouch for their witnesses. And trial judge sustains, excuse me, overrules the objection just saying, well, this is argument. So this defense attorney, excuse me, this district attorney is showing a fairly callous disregard for the limitations that counsel should have for the role they play in presenting arguments to a jury. I realize this. You are down to 45 seconds. I'll reserve whatever time. Thank you. Thank you, Your Honor. Good morning. May it please the Court. I'm Deputy Attorney General Kim Ahrens, appearing on behalf of the Respondent and Appellant in this case. The prosecutor didn't request to testify in this case. The issue didn't come up until there was controversy over the Mr. Allercon's reference. Well, I must say that the two sets of briefs totally passed tonight because you treated it as if the testimony was about nothing but this wizard thing. You never mentioned the other. And he treated it as if it was only about the opposing counsel, as if it was only  about Mr. Allercon. It wasn't very useful briefing. So certainly, I mean, the question, yes. Let's even assume that that's how it came up. The fact is that there was some testimony of this other variety. Right? So let's talk about that. There was a dispute regarding what Mr. Allercon said when he referred. I understand that. But I'm saying that there was also other testimony regarding how certain Mr. Allercon was of his identification, and that is what is alleged to be vouching, not the other. So let's talk about that. Right. The prosecutor made two statements that are at issue here, that Mr. Allercon wasn't certain about gang members' names and that he was certain about his previous identifications. The prosecutor wasn't saying Mr. Allercon's statement regarding the identifications is more credible than his trial testimony. The prosecutor was very careful not to place the prestige of the government behind Mr. Allercon's courthouse statements, or I'm sorry, jailhouse statements. But didn't he use words like positive, unequivocal, certain, which would tell the jury that the people believed this witness, that he's a credible identification witness? He did use those words, but what he was referring to was Mr. Allercon's certainty of the identification. And the jury also had evidence of the photographic identification for Mr. Allercon. I mean, what's odd about this is presumably what's disturbing about it is that prosecutors interview witnesses all the time, and they could give testimony like that all the time. And they don't because it isn't regarded as appropriate. Right? Correct. And it's – our position is not that it should be encouraged and that it's something to be avoided. But this case, the trial court – But the question is why isn't it covered by something like Berger or, as Mr. Trevino says, as an exacerbated version of something like Trevino, of something like Berger? The trial court was between a rock and a hard place. Because if the trial court had said, no, I'm not going to permit the prosecutor to testify, we would be here today addressing whether Mr. Luna's confrontation clause rights were violated, because there was exculpatory evidence. Okay. But he didn't call him. In fact, he didn't call him. It was a defense counsel for Mr. Luna's co-defendant that advised the court that we are doing something different today. All right. Fine. But he didn't in fact call him. I'm sorry, Your Honor. He didn't call him. So we wouldn't be here today unless he did call him. No, he didn't. However, when Mr. Luna moved for a mistrial, the trial court's discussion is very telling here, because the trial court says this isn't something that came up spur of the moment. We discussed this at length. We had a discussion in the hallway about it. I asked defense counsel, do you have any objection? Both of the defense attorneys said, no, we don't object. And so the trial court felt that to wait until after the fact, until after the fact, and then to raise the issue, made it difficult for the trial court to correct the error. But you're not arguing a procedural default here. No. No, we're not. But there is case law saying an objection needs to be made. And this Court recognized it, I believe, in the Prandtl decision that or, I'm sorry, in the McCoy decision, an objection needs to be made at the time. Otherwise, it's difficult to correct the error. And the Court then moves to a harmless error standard, and here under the Breck standard. And the prosecutor's testimony, first of all, was cumulative, because the detective had already testified, Mr. Alarcon was certain. With regard to Mr. Alarcon's knowledge of gang members' names, Mr. Alarcon testified during both direct and cross-examination that he wasn't familiar with the specific names of gang members. Mr. Alarcon, the jury also heard a tape recording of an interview with Mr. Alarcon where he discussed his ties with gang members and the fact that his wife was related by marriage to the gang members and his concern for his safety. So what the district court in this case found and what the California Court of Appeal found is that Alarcon's trial testimony was unbelievable anyway in light of this identification. Roberts. You mean his recantation was unbelievable. Right. But his initial identification was totally believable. Yes. I'm sorry. His trial testimony where he recanted. The court found that any error was harmless because that trial where he recanted, it was unbelievable, given this other evidence. What about, as Mr. Torvino argues, that this is particularly troublesome because the vouching, if you characterize it as that, can be described as complicit. There's two deputy DAs. There's one on direct and there's the prosecuting deputy who takes the stand. And it's clear they've orchestrated the questioning to bring out this recitation of events that Alarcon's identification was certain, unequivocal, positive. It was clearly, it would appear in reading the record, orchestrated. Doesn't that bring it to a new level of vouching? No, it doesn't. When the record is considered as a whole, the prosecutor was cross-examined at great length by both of the defense attorneys as to why this third-party shooter wasn't investigated. And they even introduced evidence that there was another gang member by the name of Wicked. So it was fair for the prosecutor to explain we didn't investigate this person because it was Alarcon's reference to the name didn't matter. He said he wasn't sure about the names and what really mattered was the photographic identifications. So it was a fair response when considered as a whole. But again, one doesn't usually put the prosecutor on to explain why they investigated whatever they investigated, or at least not the prosecutor who was prosecuted. No, but the prosecutor disagreed with Detective Lowe. And Detective Lowe said... Well, not that much. I mean, Detective Lowe couldn't have... I mean, really in a very minor way. Yes, in a minor way. Because they both agreed ultimately that he wasn't sure that it was actually Wizard, right? Yes, that's correct, but... So the only disagreement was whether he said once Wizard had the gun, but then said, but I'm not sure. And then Lowe says, well, he never said that. And Emoto says, well, he said it, but then he said, I'm not sure that's true. That's the only difference. Is that right? Emoto said he said it, but he wasn't sure about the names. Right. The question from the defense is, why didn't you investigate who was Wicked? It wouldn't have made sense to ask Detective Lowe, why didn't you investigate? Because Detective Lowe said he never even said. But the prosecutor said he did refer to someone by that name. So only the prosecutor could really explain why there was no follow-up. And the prosecutor was in a position to request that there would be some follow-up from the detective regarding a possible third-party shooter. So it made sense for the prosecutor to explain. Ultimately, if we assume vouching and error, then we fall back on a Brecht analysis. Correct. Which is essentially a harmless error standard, looking at the record in its entirety. I asked Mr. Trevino about this. Do you argue that there's other evidence such that a jury could reasonably convict and the State Court of Appeal was not unreasonable in its determination that this Alarcon and vouching incident is harmless? Absolutely. As Your Honor mentioned, the evidence of the gun underneath Mr. Luna's seat. If you took out the Alarcon testimony, you think there was sufficient evidence to correct him? Yes. There were two other witnesses. That isn't the question under Brecht. Anyway, the question is, could a jury who would have convicted him with the Alarcon evidence not convicted him without it? And the answer has to be yes. I mean, Alarcon was the only eyewitness who didn't, if you credit his original So and that gun evidence was pretty flimsy because it was just, it was not his car. It wasn't his car, but the gun was identified as. So you think the jury having that and nothing else would certainly have, would more likely than not or whatever the Brecht standard is, which is even less than that, that you would have the same confidence in the conviction just because the gun was in the car? Not the gun alone. But Kavita did make the identification during the live lineup. She did identify. Yeah, and then she completely. At the time of trial, she did recant her prior identification. In addition, Mr. Wright was positive at the time of trial. And he was all over the place. I mean, they were all. Certainly this is not a perfect case. And Alarcon was the best of them. Well, Alarcon wasn't consistent either. I mean, but. Except that they had a piece of paper that he actually signed and said it was. They did. And they did have tape recorded statements from Mr. Alarcon. But Mr. Alarcon's. So this is what I'm asking you, really. If we had to back out the Alarcon testimony on Howard and Sarah, I think you've got a big problem. The question is do you back out the testimony or do you say, well, in fact, Enomoto's sufficiently more likely that they were going to believe Alarcon's original identification? Because, as I said before, he'd already signed it. He'd already. I mean, it was plain without Enomoto saying anything that Alarcon was certain the first time. And he was totally lying this time because he was saying he didn't even write what he was clear he wrote. So does one look at it that way? Or does one just back out the Alarcon testimony? Well, it's not the Alarcon testimony that's issued. On a harmless error review, it's the prosecutor. I don't mean the Alarcon testimony. I mean the Alarcon ID. Right. It's the prosecutor's testimony. If anything should be looked at, it's would the jury have convicted without the prosecutor's testimony. Did the prosecutor vouch for Alarcon in such a way that it pushed the case toward a final bill? So our concern really would be would anybody have thought any differently of the Alarcon testimony? No. No one would have thought differently because the prosecutor, the prosecution presented evidence that Alarcon recanted because he feared for his safety. And the prosecutor didn't testify about that. The prosecutor just testified. He said here's what he said when we interviewed him in jail. With regard to Alarcon's trial testimony being different, the prosecutor offered evidence and offered a tape-recorded statement that Alarcon feared for his safety. So that explains why Alarcon's testimony was inconsistent. This is not a case where the prosecutor's testimony would have changed the outcome. And I would submit unless the Court has any further questions. Thank you very much. Thank you. Mr. Trevino. If I may, Your Honors. Just one point. As to the Brecht analysis, I think what's revealing here is the questions that the jury asked when it began its deliberations. And this, of course, was just after Deputy District Attorney Inomoto had testified. That was the close of the people's case. And then later during jury deliberations, the jury asks for a readback of Alarcon's testimony. And I think, respectfully, what that suggests, and this Court should consider it as revealing, is the jury was affected by Inomoto's testimony regarding Alarcon. Did they ask for a readback as to both Alarcon and Detective Lowe? Yes. Correct, Your Honor. Not Inomoto. No, not Inomoto. But Alarcon's testimony, I believe by the jury at that point, could only have been seen through the lens of Inomoto's testimony. Well, there's no doubt, as I just said before, that the Alarcon testimony was critical. But the question is, was Inomoto's testimony as to Alarcon's testimony critical or even important or even matter? And my suggestion to the Court is that if you do back out Inomoto's testimony, the jury would have had a very different approach to this case as it began its deliberations. Why? Because it would not have been, it would have seen him as completely and flatly incredible. And therefore, it wouldn't have had a need for any of that readback. It asked for the readback I suggest. Well, and they found him incredible at trial, no doubt about it. But why would they have found his, I mean, he had pictures that he signed. He said, I am certain. He wrote it down at the time. And then he began to go all over everywhere, and as did so many other cases. Well, only at the time. And he had, we also had Lowe saying that he was certain at the time. My client had the right not to be convicted by what happened outside of the courtroom. Outside of the courtroom? Outside of the courtroom. He had the right to be convicted only based upon evidence presented. What happened outside the courtroom? Well, what the Court, it would seem that if we're going to go on what Alarcon said during that jail interview, we're going to try to have my client convicted based on expert judicial statements. Well, but that's not the rules of evidence, right? Precisely. The rules of evidence says that if he gives an inconsistent statement, it is admissible not only for, as impeachment, but on the merits. Isn't that true? As, but that isn't the pattern we have here. We can only look at it through the lens of what actually happened, which is that Enomoto goes into it and gives it this additional span, this additional luster. And I guess, Your Honor, I see where the Court may be inclined to go, but I respectfully have to stay with the record we have. And I consider it a deficient record. But what's outside the record? I'm not understanding that. Well, if we're going to try to go to the concept of, well, maybe we could justify all of this if we just speculated that the jury would just rely on the extrajudicial statements as to their truth, because Enomoto has confirmed that what happened at Orange County Jail was accurate. But Lowe did, too. I'm sorry? But Lowe did, too. And if we had a record that only had Lowe's testimony, then we wouldn't have this problem. Mainly Lowe did. And they didn't ask to hear Enomoto. They only asked to hear Lowe. But Enomoto still got up there and gave them his version. Okay. Thank you very much. Sure, thank you. And the case is submitted.
judges: Sabraw, NOONAN, BERZON